## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DEBRA HAMAN,** | ) | **CASE NO. 8:08CV416** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM** |
| **v.** | ) | **AND ORDER** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter comes before the Court on the denial of two applications the Plaintiff, Debra Haman ("Haman"), made under the Social Security Act ("the Act"). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Tr. at 67-69.) The second is an application for supplemental security income ("SSI") benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. at 417-36.) Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Likewise, Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of the Commissioner's final determination on the Plaintiff's application for SSI benefits under Title XVI of the Act.

Upon careful review of the record, the parties' briefs, and the applicable law, the Court concludes that the Administrative Law Judge's ("ALJ's") decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the ALJ's decision as it stands as the final decision of the Commissioner.

## BACKGROUND

### 1.    Procedural Background

Haman filed her applications for disability insurance benefits and SSI benefits on June 14, 2005. (Tr. at 17.)  The claims were denied initially on September 21, 2005 (Tr. at 42-45), and again on reconsideration on January 17, 2006 (Tr. at 48-52).  An administrative hearing was held before the ALJ, James F. Gillet, on March 3, 2008. (Tr. at 17.)  On May 14, 2008, the ALJ issued a decision finding that Haman was not "disabled" within the meaning of the Act, and therefore, she was not eligible for benefits under the Act.  (Tr. at 13; 14-28.) On May 29, 2008, Haman requested review of the ALJ's determination (Tr. at 11), and on August 29, 2008, the Appeals Council denied her request for review (Tr. at 7-9).   Thus, the ALJ's May 14, 2008, decision stands as the final decision of the Commissioner, and Haman currently seeks judicial review of the ALJ's decision. (Filing No. 1, ¶ 6.)

### 2.    Factual Background

In her applications for disability insurance benefits and SSI benefits, Haman stated that she was born on October 26, 1954. (Tr. at 424.)  At the administrative hearing, Haman asserted a disability onset date of February 28, 2005. (Tr. at 425.)  She has alleged disability due to mental health issues–bipolar disorder, major depressive disorder, mood swings, poor concentration, problems with memory–and a variety of physical health problems. (Tr. at 463; 117; 123.)  Haman graduated from  high school and has completed a secretarial training course. (Tr. at 466.)  Her last period of gainful employment ended

2

February 1, 2005. (Tr. at 141.) Her past relevant work includes a number of secretarial and clerical jobs, as well as work as a dispatcher and a pizza maker. (Tr. at 106.)

A review of the medical records predating Haman's alleged onset of disability reveals that on February 1, 2005, Haman was admitted to Immanuel Medical Center in Omaha, Nebraska, for psychiatric treatment following an admitted suicide attempt. (Tr. at 195.)  There, doctors assessed her mental and physical health.  They noted Haman had a history of depression, and she was diagnosed with bipolar disorder.  (Tr. at 195-96; 201-03.)  Haman was treated for her mental health illness, as well as physical injuries from her suicide attempt.  (Tr. at 195-96; 201-03.)  She responded to treatment and was released from Immanuel Medical Center on February 5, 2005. (Tr. at 195-96; 201-03.)

Following her February 2005 presentation and treatment at Immanuel Medical Center, Haman began outpatient mental health counseling with Alegent Health Psychiatric Associates. (Tr. at 307-09.)  On March 31, 2005, at Haman's initial evaluation, Angela Hayden, MA LMHP, diagnosed Haman with bipolar disorder type II and anxiety disorder and assigned Haman a Global Assessment of Functioning (GAF) score of 45.[1] (Tr. at 307.)

---

[1] The Global Assessment of Functioning ("GAF") Scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV*) 32 (4th ed. 1994) (parenthetical examples omitted). A code of 21-30 means "[b]ehavior is considerably influenced by . . . serious impairment in communication or judgment OR inability to function in almost all areas." *Id.*  A code of 31-40 indicates "[s]ome impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* (parenthetical examples omitted).  A code of 41-50 corresponds with "[s]erious symptoms OR any serious impairment in social, occupational, or school functioning." *Id.* (parenthetical examples omitted).  A code of 51-60 means the individual has "[m]oderate symptoms OR moderate difficulty in social, occupational, or school functioning." *Id.* (parenthetical examples omitted).

Ms. Hayden developed a treatment plan that included medication and counseling, and her prognosis stated that the "probability of successful achievement of treatment goals is good." (Tr. at 307-09.)

Haman attended counseling sessions one to three times per month over six months at Alegent Health Psychiatric Associates. (Tr. at 219-22; 231; 233-37; 244-47.) Treatment notes indicate some variation in overall energy, sleep, concentration, and days of depression or mania, but they illustrate a generally consistent assessment of troubled mental health and depressed mood. (Tr. at 219-22; 231; 233-37; 244-47.) The noted exception–when Haman's symptoms were particularly severe–occurred after she had stopped taking her medications for over one month because she had lost her job. (Tr. at 219.)

On January 10, 2006, at the referral of the Disability Determination Services ("DDS") of the State of Nebraska, Dr. A. James Fix, Ph.D., performed a psychological consultative examination of Haman. (Tr. at 298.) Dr. Fix noted Haman's flat affect. (Tr. at 301.) His diagnosis assigned bipolar disorder type II, major depression, untreated alcohol dependence, and a current GAF score of 40, with her highest GAF score at 50. (Tr. at 302.) Overall, Dr. Fix posited that Haman had "difficulty in sustaining concentration" and was "apathetic," but stated Haman was "able to understand and remember instructions, and, when she does work at a task, she could probably work under ordinary supervision." (Tr. at 302.) Furthermore, Dr. Fix said Haman was "able to relate appropriately to other people" and " to adapt to changes in her environment." (Tr. at 302.)

On January 13, 2006, also at the referral of the DDS, Dr. Glenda Cottam, Ph.D., J.D., a non-examining psychologist, completed a mental residual functional capacity

4

("RFC") assessment of Haman.  (Tr. at 176-80.)  Dr. Cottam opined that although Haman did not satisfy the diagnostic criteria precisely, Haman had bipolar disorder type II and major depression, as well as alcohol dependence. (Tr. at 165; 170.)  Overall, Dr. Cottam noted Haman's capacities for "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation" were either "not significantly limited" or, at most, "moderately limited." (Tr. at 176-77.)  She was, that is, "capable of performing unskilled levels of work activity." (Tr. at 180.)

On June 13, 2006, Haman resumed counseling–this time at Douglas County Community Mental Health Center ("Douglas County"). (Tr. At 361-62.)  In her pretreatment assessment, Haman was documented as depressed, guarded, and irritable, and it was stated that she struggled with poor concentration, poor short-term memory, and anxiety with panic attacks.  (Tr. at 361-62.)  During that same initial visit, Dr. Zakaria Siddiqui, M.D., the psychiatrist overseeing Haman's treatment at Douglas County, noted in Haman's psychiatric evaluation that Haman had been "doing fairly well" until she ran out of medication. (Tr. at 358.)  He stated Haman was alert and cooperative, her mood was anxious, and her affect was appropriate. (Tr. at 359.)  Dr. Siddiqui diagnosed bipolar disorder with recent depression and alcohol abuse, and he assigned Haman a GAF score of 55.  (Tr. at 359.)

Haman began her counseling at Douglas County on July 11, 2006, with Mary Bozak, LMHP (Licensed Mental Health Practitioner).  At her corresponding medication check that day, treatment notes by Dr. Siddiqui state Haman had been intermittently compliant with her treatment regimen. (Tr. at 355.)

5

Dr. Siddiqui's August 22, 2006, treatment notes reassert bipolar disorder, and Ms. Bozak's counseling notes for August 2006, indicate that Haman had an intense mood, was anxious, and was "preoccupied" with the thought of losing disability benefits.  (Tr. at 351-52.)  Treatment notes for September 2006, through January 2007, indicate Haman was very despondent and depressed with some suicidal ideation, but that her medication was helping her. (Tr. at 347-51.)

On February 28, 2007, it was noted that Haman had increased her medication on her own. (Tr. at 347.)  This was after a phone call from Haman on January 29, 2007, reporting that she had run out of medication and needed a new prescription in order to refill her medications. (Tr. at 347.) Subsequently, in March 2007, Ms. Bozak was unable to give Haman's long-term disability provider favorable reports regarding Haman's compliance with her medication regimen or attendance at scheduled appointments; instead, Ms. Bozak noted that Haman may have been doubling her prescribed medication dosages. (Tr. at 346.)

In mid-March 2007, still at Douglas County, Lorraine Clark Benson, LMHP, LCSW (Licensed Clinical Social Worker), replaced Ms. Bozak and took over Haman's counseling. (Tr. at 345.)  On March 12, 2007, Ms. Benson noted that Haman maintained no self-confidence, struggled socially, and was somewhat dysphoric, but that she was still alert and displayed good eye contact. (Tr. at 345.)  On March, 13, 2007, in response to a request from an insurance company regarding long-term disability benefits, Ms. Benson referred the company to the most relevant and recent treatment notes regarding Haman's care because Ms. Benson admittedly had a new relationship with Haman.  (Tr. at 345.) On

6

March 19, 2007, Ms. Benson noted Haman was sad but alert, and Ms. Benson opined Haman "may be coming to [counseling] sessions just to keep disability status." (Tr. at 344.)

At a medication check on April 30, 2007, Dr. Siddiqui noted Haman was doing well. (Tr. at 343.)  In May 2007, Ms. Benson's treatment notes indicate that Haman demonstrated frequent crying, forgetfulness, suicidal ideation, flat affect, and a dysphoric mood.[2]  (Tr. at 341.)

On July 5, 2007, Ms. Benson, using relevant information from her treatment of Haman, completed a mental impairment questionnaire regarding Haman's mental impairments. (Tr. at 330.)  Ms. Benson stated that she had seen Haman four times–on March 12, March 19, May 17, and May 31, 2007. (Tr. at 330.)  Benson's questionnaire reflected a diagnosis of bipolar disorder, depression, and a current GAF score of 55, with a score of 60 assigned within the last year.[3]  (Tr. at 330.)  She stated Haman was not a malingerer.  (Tr. at 331.)  Benson opined that Haman had a "fair"[4] ability to:  remember work-like procedures; ask simple questions or request assistance; deal with normal work stress; be aware of normal hazards and take appropriate precautions; interact appropriately with the general public; and adhere to basic standards of neatness and cleanliness. (Tr. at 333-35.)  To all other skill areas or limitations on the questionnaire,

---

[2]To note, Benson saw Haman at two counseling sessions in May 2007, but therapy progress notes only exist in the record for Haman's May 17, 2007, appointment, not her May 31, 2007, session. (*See* Tr. at 330, 341; )

[3] As stated above, a code of 51-60 means an individual has "[m]oderate symptoms OR moderate difficulty in social, occupational, or school functioning."  American Psychiatric Ass'n, *DSM-IV* 32 (4th ed. 1994)(parenthetical examples omitted).

[4] "Fair" is defined as "seriously limited, but not precluded."  (Tr. at 333.)

Benson responded that Haman had "poor or no[]"[5] ability.  These include, for example, the ability to: understand, remember, or carry out very short and simple instructions; maintain attention for a two hour segment; maintain regular attendance and be punctual within customary, strict tolerances; work in coordination with or proximity to others; and maintain socially appropriate behavior.  (Tr. at 333-35.)  Ultimately, Benson posited that Haman had "marked"[6] "restriction of activities of daily living" and "difficulties in maintaining social functioning," and "extreme"[7] limitations in "maintaining concentration, persistence or pace." (Tr. at 336.)

Following Ms. Benson's completion of the mental impairment questionnaire, there is nothing in the record to suggest she counseled Haman further.  Haman did, however, continue her medication checks at Douglas County.  In October 2007, treatment notes indicate Haman was still having trouble concentrating and was suffering from bipolar disorder. (Tr. at 339.)  Treatment notes from Dr. Siddiqui's medication checks in November 2007 state Haman described herself as doing well,  her mental status was unchanged, and she was planning on traveling out-of-state to visit her brother. (Tr. at 371.)   Haman continued to visit Douglas County through January, 2008. (Tr. at 372.)

---

[5]The actual category is "Poor or None."  It is defined as "[n]o useful ability to function in this area.  (Tr. at 333.)

[6] "Marked means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively." (Tr. at 336.)

[7] "Extreme" does not have a definition provided in the mental impairment questionnaire, but it is a limitation more severe than "marked," defined above.

Overall, while undergoing treatment at Douglas County between June 2006, and January 2008, Haman attended medication checks, usually with Dr. Siddiqui, approximately once per month. (Tr. at 339-71.)  She attended approximately five counseling sessions with Ms. Bozak over the course of six months (Tr. at 347; 348; 351; 352; 355), and a total of four counseling sessions with Ms. Benson in two, non-consecutive months (Tr. at 330).

### 3.    Administrative Hearing

At the administrative hearing on March 3, 2008, Haman testified at length about her physical ailments–in particular, her vision problems–and how they affected her ability to work. (Tr. at 466-68; 470; 476-79.)  She also described her mental health problems. Describing her bipolar disorder, Haman testified that she was depressed most days of the week, and that she experienced more severe depression, which created problems with concentration, approximately three days per week. (Tr. at 474-75.)  She testified that she experienced three to four panic attacks per week that also prompted problems with concentration (Tr. at 475-76), as well as two to three manic days per month, in which she experienced uncontrollable anger and a desire to hurt herself or someone else (Tr. at 475). Haman also stated that she experienced social paranoia that would make it hard to attend work every day and that usually she did not want to leave the house. (Tr. at 483-84.)

Additionally, Haman testified that, as a consequence of her bipolar disorder, she slept two to three hours per night. (Tr. at 480.)  She testified that she usually got out of bed each day around 9:30 a.m., made her bed, ate, and then went back to bed for one to two hours. (Tr. at 481.)  After waking back up, she testified that she usually did activities around the house, like dishes, laundry, or making lunch, and that she usually took an additional

9

two or three naps in the afternoon, varying in length from thirty minutes to two hours. (Tr. at 481-82.)  But, Haman said, on some days, she cannot complete these tasks because doing so is too overwhelming. (Tr. at 481-82.)

The ALJ then asked Gail Leonhardt, the vocational expert ("VE"), to assume a hypothetical claimant with a vocational profile identical to that of Haman, meaning the hypothetical individual had an RFC for a full range of light work. (Tr. at 489.)  With respect to the hypothetical individual's mental capacities, the ALJ stated, she would have "no limitation on the ability to understand, remember, or carry out short, simple instructions." (Tr. at 491.)  She has "no limit on the ability to make judgments on simple, work-related decisions.  Her ability to interact with the public is moderately limited . . . , and with co-workers and supervisors is mildly limited." (Tr. at 491.)   The ALJ stated that the hypothetical individual would, in response to an unusual change in work situation or setting, have her work slow, but it could continue after a period of adjustment of around one-half work day. (Tr. at 492.)  If the hypothetical individual was faced with complex work-related decisions or complex jobs, she would have to ask questions of her supervisor and re-read instructions multiple times, and she would have to check with her co-workers to ensure that she was not making mistakes for up to one month, or until she was certain she was performing correctly. (Tr. at 493.)   The hypothetical individual could answer simple questions from the public, but could not answer questions that required some reference to and knowledge of written material or review of specific knowledge. (Tr. at 493.)  Her interactions with coworkers and supervisors would have to be no more than brief, infrequent conversations that did not occur within a context where the job, itself, relied on those interactions. (Tr. at 494.)

10

Given these characteristics, the VE opined the hypothetical individual would be able to "perform production work at the light exertional level." (Tr. at 494.)  That is, the VE posited the hypothetical individual could do "simple, unskilled work requiring" minimal supervisor involvement, specifically suggesting two jobs–production assembler and hand packager–of which there are a total of 16,579 in Iowa, Nebraska, Missouri, and Kansas. (Tr. at 494-95.)

Alternatively, however, when prompted by Haman's representative on cross-examination to consider a hypothetical individual of Haman's age with the functional mental limitations suggested in Ms. Benson's mental impairment questionnaire, described above, the VE stated that the limitations noted would "preclude any work activity." (Tr. at 498.)  And, similarly, when prompted by Haman's representative to take Dr. Cottam's assessment as the controlling characterization of a hypothetical individual of Haman's age, again, the VE stated that the hypothetical individual would not be able to perform any work.  (Tr. at 498-99.)

### 4.    The ALJ's Decision

On April 14, 2008, the ALJ issued his decision. (Tr. at 17-28.)  The ALJ found that Haman had not engaged in substantial gainful activity since February 28, 2005.  (Tr. at 19.)  In reviewing the record, the ALJ concluded that Haman had "the following severe impairments: bipolar disorder type II, major depressive disorder, prescription drug overuse, hand tremor, pulmonary fibrosis, carpal tunnel syndrome and spinal stenosis." (Tr. at 19.)  He did not find, however, that Haman had an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 20.)  When considering Haman's mental health impairments, the ALJ

11

first considered the medical evidence.  He stated that "[w]hile the claimant has a bipolar disorder and depression, the objective evidence reveals claimant did not have any marked or extreme limitations on her ability to work."  (Tr. at 23.)

Next, the ALJ evaluated the opinion evidence.  He concluded that Dr. Cottam's opinions were "consistent with the material medical evidence in the file, supported by the notes from treating and examining medical professionals of record and consistent with the evidentiary requirements on Social Security disability programs," and therefore should be given "some" weight. (Tr. at 25.)  He held that Ms. Benson's opinion should be "give[n] little weight" because it was inconsistent with the medical evidence of record and did not fully account for Haman's treatment history. (Tr. at 26.)  Furthermore, the ALJ held that the objective evidence, when compared to Haman's own subjective evidence, demonstrated her "allegations concerning her bipolar disorder and depression are not credible." (Tr. at 24.)

Upon consideration of the above determinations, the ALJ found that Haman had the RFC to perform "light work, subject to" stipulated "additional nonexertional limitations" due to her physical impairments. (Tr. at 26.)  Ultimately, the ALJ held that although Haman could not perform her past relevant work, she was able to perform other "jobs that exist in significant numbers in the national economy." (Tr. at 27.)  Consequently, the ALJ held that Haman "has not been under a disability, as defined in the Social Security Act, from February 28, 2005, through the date of [the ALJ's] decision." (Tr. at 27.)

### STATEMENT OF ISSUES

In appealing the final decision of the ALJ, Haman raises three issues.  She argues that the ALJ's decision was incorrect because it:  (1) improperly weighed the medical

12

evidence and other opinion evidence regarding her mental impairments in making his RFC determination; (2) improperly evaluated Haman's subjective credibility in making his RFC determination; and (3) consequently framed the hypothetical posed to the vocational expert improperly.  (Pl.'s Br., Filing No. 12.)[8]

## STANDARD OF REVIEW

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder, re-weigh the evidence, or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence on the record as a whole. *Eback v. Chater*, 94 F.3d 410, 411 (8th Cir. 1996).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001).  The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision, (*id.*), but as long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion, or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995).

---

[8] Haman orders the issues differently, but, as discussed below, they are reordered here for purposes of discursive clarity.

13

**DISCUSSION**

For the following reasons, the court concludes that the ALJ's decision is supported by substantial evidence in the record, and the court affirms the final decision of the Commissioner.

### 1.    Residual Functional Capacity and Weighing of Evidence

The determination of a claimant's RFC must be based on all relevant evidence, including the claimant's own description of her limitations. *McKinney*, 228 F.3d at 863. Consequently, to determine if the ALJ properly formulated Haman's RFC, the Court must consider not only whether the ALJ properly weighed the medical and opinion evidence from sources other than Haman, but also whether the ALJ properly considered Haman's own statements regarding her impairments. Discussion of this second issue necessarily includes the ALJ's evaluation of Haman's subjective credibility. Therefore, for discursive purposes, that issue–whether the ALJ properly evaluated Haman's subjective credibility–will be addressed here, and not separated as a different issue of error, as Haman chooses to frame and express the ALJ's alleged errors.

### A.    Whether the ALJ Properly Considered and Weighed the Medical Evidence and Other Opinion Evidence in the Record.

Haman argues that the ALJ improperly weighed the medical and other opinion evidence in the record regarding her mental impairments and functional limitations. The Court finds the ALJ did not err in weighing the medical or other opinion evidence in the record.

14

### i.  Dr. Glenda Cottam

First, the ALJ properly considered and weighed the opinion of Dr. Cottam, a state agency psychologist.  The opinions of non-examining State agency psychological consultants do not bind the ALJ.  *See* 20 C.F.R. § 404.1527(f)(2).  Rather, the ALJ must evaluate and explain the weight given to such opinions as he would any other evidence, considering factors "such as the . . . psychologist's medical specialty and expertise in [the Act's] rules, the supporting evidence in the case record, [and] supporting explanations provided by the . . . psychologist . . . ."  *Id.*  Although Dr. Cottam is a non-examining source, *see* § 404.1527(d)(1) (giving weight to an examining relationship), she is a licensed psychologist–an "acceptable medical source" under the act, *see* § 404.1513.  Furthermore, as a state agency psychologist, she is, by definition, a "highly qualified . . . expert[] in Social Security disability evaluation." § 404.1527(f)(2)(I).

In the ALJ's decision, he explicitly stated that he would give "some, but not controlling, weight to the opinions of the [s]tate agency in determining the issue of disability," and he explained why this conclusion was appropriate.  (Tr. at 25.)  He cited its consistency "with the material medical evidence in the file, . . . the notes from treating and examining medical professionals . . . [and] the evidentiary requirements of Social Security disability programs."  (Tr. at 25.)  Therefore, the ALJ properly considered and weighed Dr. Cottam's medical opinion evidence.

### ii.  Dr. A. James Fix

The ALJ properly considered and weighed the opinion of Dr. Fix, the state agency consultative examining psychologist.  Haman contends that the ALJ erred by only referring

15

to the assessment of Dr. Fix implicitly, failing to "specifically weigh the opinion of Dr. Fix." (Pl.'s Br., Filing 12, p. 26.)  Dr. Fix's opinion, however, is explicitly weighed by the ALJ as a "state agency opinion." (Tr. at 25.)   Dr. Fix, like Dr. Cottam, was a state agency consultant.  (Tr. at 298.)  He performed his psychological examination of Haman at the request of DDS.  (Tr. at 298.)  Therefore, when the ALJ explicitly considered and weighed "[t]he State agency opinions," he was referring not just to Dr. Cottam, but also to Dr. Fix. (Tr. at 25.)  Accordingly, the analysis applied to Dr. Cottam also applies to Dr. Fix, and the ALJ must evaluate and explain the weight given to such opinions as he would any other evidence. § 404.1527(f)(2).  As stated above, the ALJ explained that he was giving "some, but not controlling, weight to the opinions of the [s]tate agency in determining the issue of disability," and he outlined his reasons for doing so.  (Tr. at 25.)  Furthermore, Dr. Fix's examining relationship with Haman buttresses the ALJ's assignment of "some" weight to the medical evidence Dr. Fix offered.  *See, e.g.*, *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (holding that, where they are more consistent with and better supported by previous findings, non-treating, examining physicians' opinions could be given more weight than treating therapists' or nurse practitioners' opinions); *see also* § 404.1527(d)(1) (when assigning weight to a source's opinion, "[e]xamining relationship" should be a factor). Therefore, the ALJ properly weighed Dr. Fix's medical evidence.

Moreover, although the ALJ did not outline how Dr. Fix's assessment was weighed in such a way as to make it clear to Haman that the ALJ properly considered Dr. Fix's evaluation, this fact does not undermine the weight that should be given to evidence from Dr. Fix's examination of Haman, nor does it affect the legitimacy of the ALJ's final decision. Specifically, "[a]n arguable deficiency in opinion-writing technique is not a sufficient reason

16

for setting aside an administrative finding where, as here, the deficiency probably had no practical effect on the outcome of the case." *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987). In the present case, had the ALJ stated with specificity that Dr. Fix was a consulting psychological examiner, and thus a "[s]tate agency opinion[]",  the outcome of the case would not change.  Therefore, this lack of clarity, as perceived by Haman, is immaterial to the disposition of the case.

### iii.  Lorraine Clark Benson, LMHP, LCSW

The ALJ properly considered and weighed the opinion of Ms. Benson, Haman's treating therapist at Douglas County.  Haman's characterization of Benson as a "treating therapist" is colloquially accurate, but it is misused within the Act's statutory framework due to the special consideration and presumptive weight given to a claimant's "treating" health care provider as a source of evidence. *See* 20 C.F.R. § 1527(d)(2) (2006).

Specifically, a "treating source means [a claimant's] own physician, psychologist, or other *acceptable* medical source" who has had an ongoing medical treatment relationship with the claimant. *Id.* § 404.1502 (emphasis added).  "Acceptable medical sources" are limited to:  licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. *Id.* § 404.1513(a) (2007). This limited category of acceptable medical sources is in contrast, statutorily, to "other sources," that include: medical sources not listed in section 404.1513(a), like nurse-practitioners and therapists; educational personnel, like teachers or school counselors; and other non-medical sources, like family members.  *Id.* § 404.1513(d).

17

Lorraine Clark Benson was Haman's therapist, which means she qualifies as an "other" source for purposes of the Act. She was not, however, at any time an "acceptable medical source." These two concepts cannot be conflated for purposes of viewing Ms. Benson as an "other acceptable medical source," within the definition of a "treating source." Instead, "other acceptable medical source" is limited to those medical professionals defined as "acceptable medical sources" listed in section 404.1513(a) that are not specifically a "physician" or a "psychologist." That is, more basically, a "treating source" must be an "acceptable medical source," as defined by section 404.1513(a). Consequently, Ms. Benson is not a "treating source," as defined by section 404.1502, whose assessment should be afforded special weight for the purposes of determining Haman's alleged disability.

Haman, however, argues that Ms. Benson–an "other" source–rises to the level of a "treating source" for evidentiary purposes by virtue of her participation in a treatment plan that involved a psychiatrist–an acceptable medical source. (Tr. at 22-23.) Haman suggests that the Eighth Circuit Court of Appeals' decision in *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003), signifies that Benson is functionally a "treating source," and thus her mental health assessment should be considered accordingly. The Court, however, concludes that the relevant facts of *Shontos* diverge from the facts in the present case, and consequently, the Court finds that *Shontos* does not provide support for the Plaintiff's position.

In *Shontos,* the social security claimant, Shontos, was treated by a "team" of mental health practitioners that included a clinical psychologist, a nurse practitioner, and a counselor. 328 F.3d at 421. This "team" regularly treated Shontos over the course of

18

approximately fifteen months. *Id.* At the conclusion of their treatment of Shontos, all three mental health care providers completed evaluations specifically related to Shontos's ability to perform work-related activities, and these three evaluations, all of which were consistent, manifested a consensus regarding Shontos's RFC. *Id.* at 421-22. Comparing these evaluations to assessments provided by two non-treating, non-examining physicians, the *Shontos* Court held that Shontos's team of health care providers, including her counseling therapist and nurse practitioner, could be afforded "treating" source status for the purposes of weighing medical and opinion evidence because they were part of a "treating team" that included an acceptable medical source. *Id.* at 426; *cf. Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (explaining licensed social worker could not be given treating source status because he was not "associated with a physician, psychologist, or other acceptable medical source"); *Lacroix*, 465 F.3d at 886 (holding neither social worker nor nurse practitioner could be "treating source" because record contained no reports or involvement by acceptable medical source). That is, the *Shontos* Court held sources that ALJs usually consider to be "other" medical sources can be considered "treating" sources when they were part of, and therefore represent the views of, a treatment team that includes an acceptable medical source in accordance with the regulations. 328 F.3d at 426.

Although Ms. Benson may have been part of a treatment plan that involved more than one mental health practitioner, her treatment of Haman at Douglas County falls well short of the therapist and nurse practitioner's treatment in *Shontos*, whose opinions were given the weight of a "treating source" under § 404.1527(d)(2). Unlike the counselor in *Shontos*, who saw the patient forty-nine times in fifteen months, or the nurse practitioner

19

who regularly saw the patient for scheduled medication checks, Ms. Benson only met with Haman a total of four times over three months. (Tr. at 330.)  Her treatment of Haman was brief.  It in no way constituted the type of "ongoing treatment relationship" that provides a uniquely insightful, "longitudinal picture" of a claimant's functional impairments, s*ee* § 404.1502; § 404.1527(d)(2), and therefore, it would be inappropriate to consider her a "treating" source here.

Moreover, whereas the "team" of health care providers in *Shontos* all offered separate, yet consistent assessments of the claimant's ability to perform work-related functions, Ms. Benson's mental impairment questionnaire stands alone, as in *Lacroix* , as the only evaluation from Douglas County with a focus on work-related activities–that is, there is no report regarding Haman's work-related limitations from Douglas County by an acceptable medical source.  Overall, therefore, Ms. Benson does not, and cannot, rise to the level of a "treating" source for purposes of the Act, and her assessment of Haman's functional limitations should be weighed accordingly.

As an "other" source, Ms. Benson's opinion can serve to illustrate the severity of Haman's impairment.  *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. § 404.1513(d).  Social Security Ruling ("SSR") 06-03p provides six factors for the ALJ's consideration of opinion evidence: (1) how long and how frequently the source has seen the claimant; (2) how consistent the opinion is with other evidence on the record; (3) the amount of evidence provided to support the opinion; (4) how well the opinion is explained; (5) whether the source has relevant expertise; and (6) any other factors.  71 FR 45593, 45595.  And, in his decision, the ALJ "generally should explain the weight given to opinions

20

from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at 45596.

In the present case, the ALJ fulfilled this responsibility with respect to Ms. Benson's opinion evidence. (Tr. at 26.)  In his final decision, the ALJ stated that Ms. Benson's opinion was given "little weight," and that this conclusion was supported by the evidence in the record since Benson's treatment of Haman was brief and infrequent. (Tr. at 26.) The ALJ found that her determination that Haman was disabled, as defined by the listings, lacked supportive evidence, was inconsistent with the objective medical evidence of record, did not adequately consider Haman's "sporadic treatment history" or noncompliance with her treatment regimen. (Tr. at 26.)  Thus, the ALJ concluded that Ms. Benson "lack[ed] familiarity with the other medical source opinions in the record and the evidentiary requirements in Social Security disability programs."  (Tr. at 26.)

For the foregoing reasons, the ALJ properly considered and weighed the medical and opinion evidence in the record.

### B.    Whether the ALJ Properly Dismissed Plaintiff's Subjective Complaints.

Haman also avers that the ALJ erred when he disregarded the credibility of her subjective complaints in making his RFC determination.  As stated above, in making an RFC determination, the ALJ is required to consider the "claimant's own descriptions of [her] limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Where "the medical evidence regarding a claimant's disability is inconsistent," however, an ALJ may

undertake an analysis of the claimant's credibility and choose to discount the claimant's own statements regarding her impairments.  *McKinney*, 228 F.3d at 864.  As a preliminary matter, the ALJ's evaluation of Haman's subjective credibility and her description regarding her own impairments was proper because the medical evidence regarding her disability was not consistent.

In the Eighth Circuit, *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), stands as the guide for all credibility determinations:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the [limitations];
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

Consequently, an ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints.  *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).   The ALJ, however, is "not required to discuss methodically each *Polaski* consideration," *id.* at 972, and because the ALJ is better

22

positioned to evaluate a claimant's credibility, the Court generally defers to an ALJ's determination regarding a claimant's subjective credibility, *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006); *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, "even if every factor is not discussed in depth.").

In dismissing Haman's subjective statements, the ALJ addressed Haman's sporadic work activity, the absence of third-party opinions regarding her subjective complaints, and inconsistencies in her statements regarding the side effects of medication, her daily activities, and her functional limitations. (Tr. at 24-26.)  Furthermore, the ALJ considered, at length, evidence of Haman's noncompliance with her treatment regimen, focusing on her potential abuse of drugs that were part of her treatment plan.  (Tr. at 24.)  This "over medicating," the ALJ concluded, "detracts from [Haman's] credibility."   (Tr. at 24).  Evidence of this noncompliance is supported by substantial evidence in the record (Tr. at 331; 346; 347; 355; 358), and such noncompliance can serve as a basis for dismissing a claimant's subjective complaints, *see Guziewicz v. Barnhart*, 114 Fed. Appx. 267, 269 (8th Cir. 2004) (holding that where claimant "had been noncompliant with prescribed medical treatment," ALJ was justified in determining that claimant's subjective statements were not credible)*; Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001) (holding that an ALJ may consider noncompliance with medical treatment in his decision to dispense with claimant's subjective complaints); *see also* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled.").   This is particularly true where the evidence demonstrates the claimant's impairments were

23

controllable through compliance, *Harvey v. Barnhart*, 268 F.3d 1013, 1015 (8th Cir. 2004),

and here, the ALJ concluded that "[t]here was no indication in the evidence of record that

claimant's medications were not efficacious when taken as prescribed." (Tr. at 25.)

Thus, the ALJ did not improperly evaluate Haman's subjective credibility, and her

subjective complaints were not improperly dismissed.   Rather, substantial evidence

supports the determination that Haman's subjective complaints were not credible.

### C.   Whether the ALJ's Determination of Haman's Residual Functional Capacity Is Supported By Substantial Evidence.

Overall, considering the ALJ's proper consideration of Dr. Cottam's, Dr. Fix's, and

Ms. Benson's evidence, and Haman's own subjective credibility, it is apparent that his RFC

formulation is supported by substantial evidence in the record.

RFC is "the most [a claimant] can still do despite [her] limitations."   20 C.F.R. §

404.1545(a)(1).   "It is the ALJ's responsibility to determine [the] claimant's RFC based on

all the relevant evidence, including medical records, observations of treating physicians

and others, and [the] claimant's own description of her limitations."   *Page v. Astrue*, 484

F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).   But, it is also the ALJ's

function to weigh this evidence and "resolve conflicts among the opinions" in the record.

*Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007).

In the present case, and as stated above, the ALJ fully and properly evaluated the

evidence in the record before determining Haman's RFC.   While Haman may be able to

point to evidence that could support a finding of disability, this Court "may not reverse [the

ALJ's decision] because substantial evidence exists in the record that would have

supported a contrary outcome." *McKinney*, 228 F.3d at 863.   That is, Haman's RFC, as

determined by the ALJ, is the product of the ALJ's responsibility to weigh and reconcile potentially conflicting evidence in the record, *see* 20 C.F.R. §404.1527(c)(2), and the dutiful fulfillment of that role is not to be overturned or superseded by the Court, s*ee id.* Therefore, the Court finds that, having properly considered the evidence in the record, the ALJ consequently determined Haman's RFC properly.

### 2.    Whether the Hypothetical Posed to the Vocational Expert Constitutes Substantial Evidence.

Finally, the Plaintiff argues that the VE's testimony at the hearing is not supported by the substantial evidence on the record.  The Court, however, finds that the VE's testimony regarding the hypothetical individual characterized by the ALJ constitutes substantial evidence.  A VE's testimony is substantial evidence "only when the testimony is based on a correctly phrased hypothetical question . . . ." *Roberts v. Apfel,* 222 F.3d 466, 472 (8th Cir. 2000) (quoting *Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997)).  Where the ALJ determines evidence of certain impairments is not supported or is not credible, however, the ALJ may properly exclude those impairments from the hypothetical question posed to the vocational expert. *McKinney*, 228 F.3d at 865 (the hypothetical question posed to a vocational expert "need only include impairments that are supported by the record and which the ALJ accepts as valid.").  Thus, within the scope of the ALJ's inherent discretion to weigh the evidence and determine the claimant's RFC, the ALJ can tailor the hypothetical posed to the VE to fit the ALJ's RFC determination, and a response to that hypothetical still constitutes substantial evidence.  *Lacroix*, 465 F.3d 881, 887-88.

The gravamen of Haman's challenge to the ALJ's hypothetical question is that it "ignored" the limitations suggested in Ms. Benson's opinion evidence. (Pl.'s Br., Filing 12,

25

p. 28.)  As stated above, however, the ALJ properly considered and, consequently, properly gave Ms. Benson's assessment of Haman's limitations "little weight." (Tr. at 26.) Thus, having properly balanced this opinion evidence with the other evidence in the record, it follows that the hypothetical question posed to the VE was not erroneous–it represented only those impairments the ALJ determined were supported by substantial evidence in the record.

Because the hypothetical posed to the VE by the ALJ reflected the ALJ's proper determination of Haman's RFC, the Court holds that the VE's response to that hypothetical is substantial evidence that Haman can perform work in the national economy and therefore is not disabled under the Act.

## CONCLUSION

For the aforementioned reasons, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1.  The decision of the Commissioner is affirmed and the Plaintiff's appeal is denied; and

2.  Judgment in favor of the Defendant will be entered in a separate document.

DATED this 26th day of June, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge